IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2024

**STATE OF TENNESSEE v. UEL PEARSON**

**Appeal from the Circuit Court for Gibson County**
**No. 19-685    Clayburn Peeples, Judge**

_____

**No. W2023-00254-CCA-R3-CD**

_____

The defendant, Uel Pearson, was convicted by a Gibson County jury of first-degree murder, attempted first-degree murder, and employing a firearm during the commission of a dangerous felony after having been previously convicted of a dangerous felony for which he received an effective term of life imprisonment plus thirty years.  On appeal, the defendant argues that: (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred in excluding the recorded interviews of two witnesses; and (3) the trial court erred in denying his motion for new trial based on juror misconduct.  After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

W. Taylor Hughes, Alamo, Tennessee (on appeal), and Marcus A. Lipham, Jackson, Tennessee (at trial), for the appellant, Uel Pearson.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Amy P. Weirich, District Attorney General Pro Tem; and Christopher J. Lareau and Robert Bradford Reasonover, Assistant District Attorneys General Pro Tem, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

The defendant and a co-defendant, Lillo Harrell, were indicted for the first-degree murder of Rontavious Maurice McKinley, the attempted first-degree murder of Sharonda

Simmons, and employing a firearm during the commission of a dangerous felony after having been previously convicted of a dangerous felony, arising out of a home invasion-shooting in which Mr. McKinley was killed and Ms. Simmons suffered multiple gunshot wounds. The State's proof at trial showed that Mr. McKinley and his girlfriend, Ms. Simmons, were lying in bed in Ms. Simmons' bedroom around 12:30 a.m. on October 11, 2016, when the bedroom door opened, the light turned on and quickly off, and a man with stocking hose over his face started shooting.

Lieutenant Greg Bookout with the Milan Police Department responded to a shooting call on Patton Street in Milan, Tennessee, at 12:39 a.m. on October 11, 2016. He was met by witnesses outside the home who directed him to a bedroom at the back of the house. Lieutenant Bookout found two victims in the bedroom, Ms. Simmons was lying on the bed and Mr. McKinley was unresponsive on the floor next to the bed. In what Lieutenant Bookout described as a "brutal scene," he noted that both victims had been shot multiple times. Ms. Simmons told Lieutenant Bookout that someone had come into the room and shot them but that was the only information she could provide. Lieutenant Bookout was wearing a body camera that night, the footage of which was played for the jury. Lieutenant Bookout was unable to develop any suspects while on the scene.

The State played a number of 911 calls for the jury through the testimony of Kirby Jaco, keeper of records for Gibson County 911. Thereafter, the State introduced, and read into the record, the transcript of the preliminary hearing testimony of Ms. Simmons who was determined to be an unavailable witness under Tennessee Rule of Evidence 804(a)(5).

According to her prior testimony, Ms. Simmons stated that at the time of the shooting, she lived in a house on Patton Street with her friend, Ayanna Boyce. On the night of October 10, 2016, Ms. Simmons, Ayanna Boyce, Makayla Boyce, and the defendant were present in the home. Ms. Simmons and Ayanna Boyce were in their respective bedrooms, and Makayla Boyce was a guest staying on the couch in the living room. Ayanna Boyce and the defendant were in a relationship, and he was visiting her that evening.

Ms. Simmons' boyfriend, Mr. McKinley, arrived around 11:00 or 11:30 p.m., and Ms. Simmons went into the kitchen to prepare something for him to eat. The defendant was leaving at the same time Mr. McKinley arrived, and the two of them had a brief exchange of words. The defendant said to Mr. McKinley that he looked familiar, and Mr. McKinley responded, "'You know me' and kind of laughed it off." The defendant then walked out the door.

Ms. Simmons and Mr. McKinley retired to her bedroom to go to sleep. While they were lying in bed but yet to have fallen asleep, possibly around 12:00 or 12:30 a.m.,

someone kicked in the bedroom door, briefly flicked the light on and off, and started shooting. Ms. Simmons saw that the shooter had stocking hose over his face, but she was unable to identify him through the stockings. Ms. Simmons was shot eleven times and had to receive medical treatment for her injuries.

Teresa Garrett, one of Ms. Simmons' neighbors, had exterior video surveillance cameras on her house that captured two individuals running from Ms. Simmons' home after the shooting. Ms. Garrett provided the footage to law enforcement, and the video and a map of the street were introduced at trial during her testimony.

Sharon Gillespie, a dispatcher and correctional officer for the Milan Police Department, participated in the prisoner intake process when the defendant was brought into jail on November 2, 2016. The defendant provided information to Ms. Gillespie, including his phone number, which she recorded on the booking sheet. The booking sheet was introduced at trial.

Lieutenant Jason Williams with the Milan Police Department responded to the scene after the initial officers to begin investigating the shooting. When Lieutenant Williams arrived, Ms. Simmons was in an ambulance in front of the house, Ayanna Boyce and Makayla Boyce were outside the home, and Mr. McKinley had already been transported to the hospital. The scene was "pretty chaotic" and there was a lot of blood, particularly in the bedroom where the shooting took place. Officers took numerous photographs of the scene, as well as collected evidence such as shell casings and bullet fragments.

During his investigation at the scene, Lieutenant Williams learned from the witnesses that the defendant had been present in the home briefly prior to the shooting. Lieutenant Williams obtained the defendant's phone number from Ayanna Boyce and requested a search warrant for the defendant's cellphone records. The defendant's cellphone records revealed that he texted the statement, "That 'N word' here" to another number at 11:52 p.m. Lieutenant Williams researched the number the defendant had texted and learned that it belonged to Lawrence Douglas. Based on a timeline review of the defendant's phone records, the witnesses' statements, and the neighbor's surveillance footage, Lieutenant Williams believed the defendant was one of the subjects who fled the victims' home.

In addition to the defendant and Lawrence Douglas, officers developed two additional suspects during the course of the investigation, the defendant's brother, Tabeel Pearson,[1] and Lillo Harrell. One witness thought Tabeel Pearson had a necklace like that

---

[1] At times, this individual will be referred to only as "Tabeel" to avoid confusion between him and the defendant. We mean no respect by this practice.

worn by one of the suspects, but officers did not find any connection between Tabeel and the homicide. Mr. Harrell matched the build of one of the suspects in the surveillance video and was a known associate of the defendant.

Based on the text message exchange with the defendant, officers began searching for Lawrence Douglas in order to bring him in for questioning. Officers eventually located and conducted a traffic stop of Mr. Douglas on November 1, 2016. Mr. Douglas initially lied and told officers "he didn't have nothing to do with it. He wasn't there." However, when confronted with evidence from the investigation, "that's when [Mr. Douglas] started telling some of the truth." Lieutenant Williams elaborated that "after [Mr. Douglas] finally got over [the] 'I wasn't there; I didn't do it' attitude[,] . . . he started to tell [the truth] . . . [and] just added a little bit each time." Mr. Douglas eventually provided information leading officers to seek arrest warrants for the defendant and Mr. Harrell.

During the interview, Mr. Douglas said that after he received the text message from the defendant, the defendant and Mr. Harrell came to his house and had Mr. Douglas drive them to a Gangster Disciple party on Cherry Street. Lieutenant Williams knew the location to be about a block from the location of the homicide. While at the gang party, Mr. Douglas overheard the defendant tell other gang members that he had "just run into . . . the opposite position" and was going to "tak[e] care of business." The defendant and Mr. Harrell then had Mr. Douglas drive them to the corner of Ennis and Carroll Streets to "handle the business." Mr. Douglas observed the two men pull stocking hose down over their heads and exit the car with guns. He saw them head down Carroll Street toward Patton Street. After a brief time, they came running back and got in his car.

Officers obtained a search warrant for the defendant's residence and, during its execution, found a black sweatshirt with a king playing card on the front of it. The sweatshirt matched the clothing Mr. Douglas told the officers in his interview that the defendant directed Mr. Douglas to say the defendant was wearing when the defendant was formulating an alibi. Officers also searched Mr. Harrell's residence and, during which, found a Gangster Disciple bible, which contained the by-laws and members of the gang, and a gun magazine with ammunition. The ammunition found in Mr. Harrell's house matched the brand and caliber recovered from the crime scene. A handgun was recovered from Mr. Douglas during the traffic stop, but it did not match the caliber of the casings found at the scene.

Prior to the cross-examination of Lieutenant Williams, defense counsel indicated his intent to use the video recording of Mr. Douglas' interview to impeach Lieutenant Williams' testimony. The State objected on grounds that the contents of Mr. Douglas' recorded interview would be hearsay and that Mr. Douglas had yet to testify. Defense counsel explained that the purpose of using the recorded interview was to "show the . . .

pattern of the interrogation as the story changes." The court found that use of the recorded interview might be appropriate after Mr. Douglas testified.

On cross-examination, Lieutenant Williams acknowledged that the none of the possible latent fingerprints or swabs for possible DNA from the crime scene implicated the defendant. DNA testing of the pistol and magazine recovered during the traffic stop of Mr. Douglas returned an inconclusive profile. The nine-millimeter magazine and ammunition recovered from Mr. Harrell's home matched the brand and caliber from the crime scene, but the DNA profile obtained from those items was inconclusive.

Lawrence Douglas testified that he was interviewed by Lieutenant Williams on November 1 or 2, 2016, regarding his involvement in the crime and that he had testified consistently in two prior hearings in March 2017. He acknowledged he met with prosecutors and hoped to receive some sort of favorable treatment for his testimony but stated he had not been promised anything.

Mr. Douglas stated that he was formerly a member of the Gangster Disciples gang but was inactive at the time of the offense due to a financial situation. Mr. Douglas described his history with the gang and the forms of punishment used by the gang. He also explained the organizational structure for the Gangster Disciples and the roles of each rank within the gang. In 2016, before he went inactive, Mr. Douglas held the rank of Assistant Chief Enforcer. The defendant held the rank of Chief Enforcer, and Mr. Harrell held the rank of Chief of Security. Both men were ahead of Mr. Douglas in rank. Tabeel Pearson, the defendant's brother, was also an Enforcer.

According to Mr. Douglas, the defendant had a known "beef" with Jason Cox, a member of the Rollin' 60s Crips, because Mr. Cox was rumored to have shot the defendant. Mr. Douglas knew the deceased victim, Mr. McKinley, and knew that Mr. McKinley was friends with Mr. Cox. Mr. Douglas did not know whether Mr. McKinley was a member of the Crips.

Mr. Douglas recalled that on the night of October 10, he received a text message from the defendant saying, "That n****r is here." Mr. Douglas responded, "Where he at?" The defendant then texted Mr. Douglas asking where he was, and Mr. Douglas said he was at home. The defendant and his brother, Tabeel, showed up at Mr. Douglas' home. The defendant had been drinking and was armed with a gun. Mr. Harrell arrived while they were outside talking on the porch and spoke with the defendant and Tabeel on the steps. Mr. Harrell left, and the defendant and Tabeel got into Mr. Douglas' car for Mr. Douglas to drive them to a Gangster Disciples party on West Cherry Street.

When they arrived, the defendant and Tabeel got out of the car, but Mr. Douglas was instructed to get back in the car because he was not an active member at the time. Mr. Douglas explained that inactive members were not allowed to be present for private conversations amongst active members. However, Mr. Douglas overheard the defendant say, "I don't care. I don't care if they 20, 40, 60, 80, 100. I don't care." Mr. Douglas understood the defendant's statement to mean "there was something extra going on" and that the numbers described different sects of the Crips.

Mr. Douglas got out of his car to tell the defendant that he was going to leave, but the defendant instructed him to stay because Mr. Douglas was his ride. While he was waiting, Mr. Douglas saw the defendant and Mr. Harrell put stocking hose over their faces and walk in the direction of a house across the street. Both men were armed with guns. As the defendant and Mr. Harrell walked away, Mr. Douglas stood talking to Tabeel Pearson and said to him, "Look, my car don't go that fast, you know what I'm saying?" and "[M]y car don't go over 20 at the time unless you just really play with it." Tabeel then checked the doors of some nearby cars and said, "Ain't no doors open. Ain't no keys." Tabeel walked away, and Mr. Douglas drove off.

However, as Mr. Douglas was driving down the street, the defendant and Mr. Harrell came up to his car with guns so he stopped. Mr. Harrell got into the back seat and the defendant got into the front seat, and Mr. Douglas drove them to Mr. Harrell's house. During the drive, Mr. Harrell bragged, "I got him." When they got to Mr. Harrell's house, they got into a verbal altercation because Mr. Harrell and the defendant wanted to leave their guns in Mr. Douglas' car but Mr. Douglas wanted them to take the guns. As they were "going back and forth," Mr. Douglas heard sirens and told them to leave. Mr. Harrell put the guns in a plastic garbage bag Mr. Douglas had in the back seat and left the bag in the car. Mr. Douglas then left and drove home.

The next day, Mr. Harrell showed up at Mr. Douglas' house to get the guns and bragged about what had happened. Mr. Harrell and Mr. Douglas got into a verbal altercation because Mr. Douglas felt that the other men tried to "put[] it on [him]" by leaving the guns in the car. Mr. Douglas learned who had been killed from Facebook and the news. Mr. Douglas was not aware of "any beef" between the defendant and the deceased victim, Mr. McKinley.

About a week later, the defendant contacted Mr. Douglas and, after a brief exchange, Mr. Douglas went to the defendant's house. The defendant had a gun in his hand when he came to the door. The defendant gave Mr. Douglas some money and asked Mr. Douglas to throw away the clothes the defendant was wearing on the night of the homicide for him. The defendant instructed Mr. Douglas that, "If anybody asks, tell them I was with you." Mr. Douglas elaborated that he was supposed to say that the defendant was at Mr. Douglas'

house with him and that the defendant was wearing jeans and a pullover with a king playing card on it.

Mr. Douglas recalled that on November 1 or 2, 2016, he was arrested at a traffic stop and brought to Lieutenant Williams and another officer for questioning. Mr. Douglas admitted that he initially lied to the officers about the incident and said that he was at home and the defendant was with him. Mr. Douglas explained that he lied because he had ties to the defendant – the defendant was Mr. Douglas' son's godfather and his son was named after the defendant.

During the interview process, the officers confronted Mr. Douglas with the text messages sent to him by the defendant, and the interrogation went into the next day. "[W]hen [he] saw everything was going to fall on [him] for something [he] didn't do[,]" Mr. Douglas began to tell the truth. Mr. Douglas ultimately chose his son and family over the defendant. Mr. Douglas said that once he told truth during his interview, his statement did not change. Mr. Douglas acknowledged that he was charged in the case with accessory after the fact and criminal responsibility.

On cross-examination, Mr. Douglas testified that while he was being interrogated, the officers brought his son to the holding cell window for him to see, but he "never got to touch [his] son." After a series of other questions, defense counsel announced its intent to show the video recorded interview of Mr. Douglas to impeach his testimony. Defense counsel asserted that Mr. Douglas stated twice that his story had not changed since November 1 and had also said that "he never held his child." The State responded that Mr. Douglas admitted to lying and changing his story so a prior inconsistent statement was no longer admissible. The trial court asked defense counsel to explain how the video would add to Mr. Douglas' testimony that he changed his story once he realized he was in trouble. Defense counsel indicated that Mr. Douglas' story changed during the interview from November 1 to November 2. The trial court directed defense counsel to clear up the timing of Mr. Douglas' change of story through further cross-examination. Thereafter, in response to questioning by defense counsel, Mr. Douglas stated that his story did not change "[a]fter [he] came back and [he] talked to the . . . detective." Mr. Douglas clarified, "First you asked me have I changed my story. I told you I have. I told you no since the 1st, do you see what I'm saying? That was the day after they talked to me, sir."

The trial court then conducted a brief bench conference to revisit the issue of impeaching Mr. Douglas' testimony regarding contact with his son during the interview. The court directed defense counsel to re-question Mr. Douglas about the contact, and, in response to those questions, Mr. Douglas stated that he only remembered seeing his son from the cell, he did not remember touching him. Defense counsel was then permitted to show a still frame from the video of Mr. Douglas' interview showing Mr. Douglas holding

his baby. Defense counsel also introduced a flash drive of Mr. Douglas' interview into evidence, but the recording was not used at trial beyond the cross-examination of Mr. Douglas regarding his contact with his son.[2] Mr. Douglas said that he did not consider the contact with his son as a threat or coercive tactic by the officers.

Dr. Marco Ross, the Chief Medical Examiner for the West Tennessee Regional Forensic Center, testified concerning the autopsy of Mr. McKinley. The autopsy revealed that Mr. McKinley was shot eight times, including on the right side of his head and right side of his chest. Mr. McKinley's cause of death was determined to be multiple gunshot wounds and manner of death was homicide.

Following the conclusion of the proof, the jury convicted the defendant, as charged, of first-degree murder, attempted first-degree murder, and employing a firearm during the commission of a dangerous felony after having been previously convicted of a dangerous felony. The trial court conducted a sentencing hearing, after which it imposed a sentence of life imprisonment plus thirty years. This appeal followed.

## *Analysis*

### I. Sufficiency

The defendant challenges the sufficiency of the evidence. The defendant does not challenge the elements of any of the offenses but, instead, challenges the proof establishing his identity as one of the perpetrators. The State argues the evidence is sufficient to sustain the defendant's convictions. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge,

---

[2] The trial court later instructed the jury that "Exhibit number 14 is an audio tape of an interview of Lawrence Douglas, only a small part of which was entered into evidence. You may listen to that part again, but not the entire interview."

- 8 -

accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

"The identity of the perpetrator is an essential element of any crime." *Rice*, 184 S.W.3d at 662 (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The burden is on the State to prove the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). The identification of the defendant as the perpetrator is "a question of fact for the jury upon its consideration of all

competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)).

At trial, the State presented the jury with the theory that even if it was not the defendant who directly discharged his firearm into Ms. Simmons' bedroom, the defendant was guilty of the crime under a theory of criminal responsibility. Under Tennessee law, a person may be charged with an offense if "he or she is criminally responsible for the perpetration of the offense." Tenn. Code Ann. § 39-11-401. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . ., based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

"Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred." *State v. Caldwell*, 80 S.W.3d 31, 37-38 (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). To be criminally responsible for the acts of another, the defendant must "in some way associate himself with the venture, act with the knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *Id.* (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)).

In addition, while the defendant does not specifically make such argument, inherent in his assertion on this issue is that Mr. Douglas' accomplice testimony was not sufficiently corroborated. It is well-established that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (citing *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). This Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). The test of whether a witness qualifies as an accomplice is "whether the alleged accomplice could be indicted for the same offense charged against the defendant." *Id.* It is not in dispute that Mr. Douglas qualified as an accomplice.

Our supreme court has described what is required to establish sufficient corroboration as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is

implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw*, 37 S.W.3d at 903 (quoting *Bigbee*, 885 S.W.2d at 803). The corroborating evidence need only be "slight." *State v. Griffs*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Whether sufficient corroboration exists is for the jury to determine. *Shaw*, 37 S.W.3d at 903.

Viewed in the light most favorable to the State, the direct and circumstantial evidence was sufficient to establish the defendant's involvement in the shooting. Ms. Simmons saw the defendant at her home approximately an hour or hour and a half before the incident and observed the defendant and Mr. McKinley have a verbal exchange. Upon learning of the defendant's presence at the scene, Lieutenant Williams obtained the defendant's cellphone records and discovered that the defendant texted the statement, "That 'N word' here" to Mr. Douglas shortly after leaving Ms. Simmons' home. After the text exchange with Mr. Douglas, the defendant and two other members of the Gangster Disciples, Tabeel Pearson and Mr. Harrell, showed up at Mr. Douglas' home and engaged in a discussion. Mr. Douglas drove the defendant to a gang party, which was near the victims' home, and the defendant met up with Mr. Harrell again. Mr. Douglas heard the defendant discussing with other gang members about "something extra going on" involving the Crips. Mr. Douglas described Mr. McKinley's connection to a member of the Crips, Jason Cox, with whom the defendant "had a beef." Mr. Douglas saw the defendant and Mr. Harrell put stocking hose over their faces and walk in the direction of a house across the street. Both men were armed with guns. According to Ms. Simmons, the shooter was wearing stocking hose over his face. A short while later, the defendant and Mr. Harrell ran back to Mr. Douglas' car. Footage from a neighbor's surveillance camera showed two suspects fleeing Ms. Simmons' home. When the men got back into Mr. Douglas' car, Mr. Harrell bragged, "I got him." According to Mr. Douglas, the defendant later attempted to fabricate an alibi and told him of the clothing to say the defendant was wearing on the night of the homicide. During the investigation, Lieutenant Williams recovered that distinctive clothing from the defendant's home.

Moreover, Mr. Douglas' testimony was sufficiently corroborated by the defendant's text messages, Ms. Simmons' description of the shooter, the neighbor's surveillance footage showing two individuals running from the victims' home, and officers' recovery of the distinctive clothing mentioned in the defendant's fabricated alibi. This evidence

fairly and legitimately tended to connect the defendant with the commission of the crime sufficient to corroborate the testimony of Mr. Douglas. Therefore, we conclude that the evidence is sufficient to sustain the jury's verdict, and the defendant is not entitled to relief.

## II. Videotaped Witness Interviews

The defendant argues that the trial court erred in excluding the recorded interviews of two witnesses, Lawrence Douglas and Sharonda Simmons. The State responds that the trial court properly denied the defendant's use of Mr. Douglas' recorded statement, and the defendant's claim concerning use of Ms. Simmons' recorded statement is waived. We agree with the State.

### A. Lawrence Douglas

The record shows that the defendant attempted to use the video recording of Mr. Douglas' interview with the police on two occasions at trial; namely, during the cross-examinations of Lieutenant Williams and Mr. Douglas to impeach their testimonies. The defendant asserts that the recording qualified as a prior inconsistent statement and that the denial of its use limited his Sixth Amendment right to cross-examine witnesses provided by the Confrontation Clause. He also asserts the video should have been allowed to show a pattern of coercion used during the interview process.

"Generally, questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record." *State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014).

Tennessee Rule of Evidence 613(b) provides in pertinent part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." When presented with a prior inconsistent statement, a witness "has several possible responses: the witness can admit, deny, or not remember making all or part of the statement." Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.13[5][a] (6th ed. 2011). If the witness admits making the prior inconsistent statement, extrinsic proof of the statement would be cumulative and, therefore, inadmissible. *Id.*; *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) ("Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement."). Tennessee Rule of Evidence 803(26) provides an exception to the rule against hearsay allowing for a prior inconsistent statement of a testifying witness to be considered as substantive evidence if otherwise admissible under Rule 613(b) and if: (1) the declarant

testified at trial and was subject to cross-examination about the statement; (2) the statement is an audio or video recorded statement, a signed written statement, or a statement given under oath; and (3) the trial court determines after a jury-out hearing by a preponderance of the evidence that the witness made the prior statement under circumstances indicating trustworthiness. Tenn. R. Evid. 803(26)(A)-(C).

Lieutenant Williams testified that Mr. Douglas initially lied and told officers "he didn't have nothing to do with it. He wasn't there." However, when confronted with evidence from the investigation, "that's when [Mr. Douglas] started telling some of the truth." Lieutenant Williams elaborated that "after [Mr. Douglas] finally got over [the] 'I wasn't there; I didn't do it' attitude[,] . . . he started to tell [the truth] . . . [and] just added a little bit each time."

Mr. Douglas repeatedly acknowledged at trial that he initially lied to the police in his interview but, after being confronted with the evidence, he began telling the truth about the homicide and the actions of the various players. He stated that he had remained consistent in his story once he told the truth. Accordingly, Mr. Douglas was impeached about his truthfulness during the interview process and extrinsic evidence from the recording was inadmissible as cumulative. Further, any assertion by the defendant that the recording should have been entered as substantive evidence fails because it does not meet the conditions of admissibility under Rule 613 nor did the defendant request a jury-out hearing for the court to determine by a preponderance of the evidence that the statement was trustworthy. *See* Tenn. R. Evid. 803(26)(C).

Even if this Court were to determine that the video could have been used to impeach Mr. Douglas, Rule 613 would not have permitted the playing of the entire recorded statement as urged by the defendant. Only the portions of the statement that a witness denies or cannot recall making would be admissible under Rule 613(b). *State v. Foust*, 482 S.W.3d 20, 41 (Tenn. Crim. App. 2015) (citing *Martin*, 964 S.W.2d at 567). As another panel of this Court has recently explained, "Rule 613 does not require the playing of an entire recorded statement that could include statements not previously brought to the attention of the witness, statements that may be consistent with the witness's trial testimony, and statements that the witness remembers and readily agrees to have made." *State v. Gardner*, 2023 WL 4994967, at *22 (Tenn. Crim. App. Aug. 4, 2023), *perm. app. denied* (Tenn. Dec. 19, 2023).

With regard to use of the recorded interview to impeach Lieutenant Williams' testimony, such use during Lieutenant Williams' testimony was clearly hearsay and inadmissible pursuant to the rules of evidence. *See* Tenn. R. Evid. 801(c) and 802. Moreover, the defendant's suggestion that use of the recording should have been allowed to show a pattern of coercion during the interview process is without support in the record.

The defendant never questioned Lieutenant Williams as to any coercion, and Mr. Douglas testified that he did not view the detectives as engaging in threatening or coercive tactics. The defendant is not entitled to relief on this issue.

### B. Sharonda Simmons

The defendant also argues that the trial court improperly denied him the opportunity to use Sharonda Simmons' recorded interview at trial, during which he alleges Ms. Simmons "made statements regarding another potential suspect." In the defendant's brief, however, appellate counsel acknowledges that counsel "is unable to locate anywhere in the record where trial counsel attempted to introduce the video interview of Witness Simmons. Likewise, counsel is unable to locate in the record where the trial court erred by ruling that the evidence was inadmissible." The defendant undisputedly raised this claim for the first time in his motion for new trial. Moreover, while the defendant discussed his purposes for wanting to utilize the video, the defendant did not introduce the video at the motion for new trial hearing.

This issue is waived. This Court is not required to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). The defendant never sought admission of the video interview; therefore, he cannot argue that its exclusion was erroneous. Similarly, the defendant's brief is inadequate because he did not provide specific references to the record where the erroneous action occurred or the matter was called to the attention of the trial court. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The defendant is not entitled to relief on this issue.

## III. Juror Misconduct

The defendant lastly argues that the trial court erred in denying his motion for new trial based on his allegation of juror misconduct. The State responds that the trial court properly denied the defendant's motion. We agree with the State.

Every criminal defendant enjoys the right to a trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)). The validity of a jury verdict will be considered questionable "[w]hen a jury has been subjected to either extraneous prejudicial information or an improper outside

influence." *Id.* (citing *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)). Extraneous prejudicial information includes "information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Id.* (citations omitted). Improper outside influence is "any unauthorized private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

The challenging party "must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Id.* at 651 (citing *Caldararo*, 794 S.W.2d at 740-41). If successful, "a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless." *Id.* (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)). A violation of the constitutional right to an impartial jury presents a mixed question of law and fact which this Court reviews de novo, affording a presumption of correctness only to the trial court's findings of fact. *Adams*, 405 S.W.3d at 656 (citing *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001)).

In his motion for new trial, the defendant alleged that a juror provided information concerning misconduct to his trial counsel, and counsel submitted his own affidavit in support of the allegation. In his affidavit, counsel stated that he spoke with a juror, Candace Paige, over the phone and that Juror Paige told him that during its deliberations, the jury "did our research, and you weren't his first lawyer." However, Juror Paige testified at the motion for new trial hearing, and her testimony did not support the allegation. Trial counsel specifically asked Juror Paige if she or any other juror researched or learned of information during the trial that was not introduced into evidence, and Juror Paige denied the allegation. Counsel did not present any other evidence in support of this allegation.

Counsel's affidavit, which is unsupported by testimony or other evidence, is not sufficient evidence to meet the defendant's burden of proving that the jury was exposed to extraneous prejudicial information. Accordingly, the trial court did not err in denying the defendant's motion for new trial based upon juror misconduct.

## *Conclusion*

Based on the forgoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE